UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

JOHN DOE,                                                    Case No.

                Plaintiff,                          COMPLAINT & DEMAND
                                             FOR JURY TRIAL

     v.

MARIST COLLEGE,
                Defendant.

------------------------------------------------------------------------x

Plaintiff JOHN DOE ("Plaintiff" or "Doe"), a pseudonym, by and through his attorney, LEONARD J. CATANZARO, ESQ., as and for his Complaint against the Defendant MARIST COLLEGE (hereinafter "MARIST" or the "College" or "Defendant") respectfully alleges as follows:

### THE NATURE OF THIS ACTION

1. At all relevant times herein, the Plaintiff Doe, was a full time matriculated student at Marist College, with no prior record either in criminal court or family court.

2. On April 2, 2024, Doe's ex-girlfriend, ("the reporting party") filed a complaint of "dating abuse" with Marist College under Title IX.

3. Title IX is of the Education Amendments of 1972, which is a federal civil rights law that is part of 20 U.S.C. §1681 et seq.

---

1. Footnote:

    On or about April 29, 2021, Mid Hudson News reported that Marist College was criticized and "has ignored serious complaints about students' behaviors, causing dangerous sexual assault and domestic violence behavior to be further and normalized only in resulting in it escalating further."

    On or about April 28, 2021, the Poughkeepsie Journal wrote an article "Marist students call for increased Title IX funding, transparency in claims of abuse."

    Plaintiff alleges that, at all times relevant herein, Marist College was under pressure to find those individuals accused of Title IX violations liable, including plaintiff, and in doing so, to protect itself and its Title IX federal funding dollars, did not follow, and otherwise violated, Marist College's own Title IX procedures, and Federal Law, through its employees, representatives, and agents.

4. On or about July 5, 2024, in a decision ("the decision") by a Marist College Title IX panel, Doe was given the most severe punishment, and expelled from the college after Marist College conducted a sham hearing on June 21, 2024 and June 24, 2024. Exhibit A.

5. Doe brings this Complaint to remedy the devastating impacts of an unfair, improper, and biased hearing and adjudication by Defendant, which resulted in Plaintiff's expulsion from MARIST, and a transcript notation, "expelled after a finding of responsible for a code of conduct violation."

6. MARIST, through the engagement of biased individuals, employed a process that violated Marist College's own Title IX procedures, and Federal Law, and was intended to give the appearance of fairness but which was, in truth, a mere formality, wherein Plaintiff was presumed guilty from the start and was ultimately going to be found responsible regardless of the actual facts or evidence in the case.

7. The various procedural irregularities in the hearing committed by Marist College, by and through its various employees, require that the decision and determination of liability and sanctions be vacated and cancelled, and that plaintiff be re-instated into the College.

8. If Marist College's improper decision is permitted to stand, Plaintiff will be immediately, irreparably, and seriously harmed, in that: (i) he will be deprived of the opportunity to timely complete his undergraduate coursework; (ii) he will be deprived of the timely issuance of his diploma; (iii) he will suffer severe reputational harm and stigma, by way of a permanent notation on his transcript indicating he was expelled after being found responsible for a code of conduct violation; (iv) he will lose the opportunity to begin full-time employment; and (v) he will forever have to explain to any school, job, or program that he applies to, that he was expelled from MARIST after a finding of misconduct, thereby severely limiting his future

education and career opportunities; (vi.) and he will lose the monies paid into Marist College; and (vii.) Doe will suffer financial hardship in losing the financial aid, grants, and/or scholarships, issued from Marist College, and will have to pay higher colleges tuition and housing costs in the future.

9. Doe submitted an appeal of said decision with Marist College and said appeal was denied, and therefore Doe has exhausted all other avenues and therefore comes to this Court.

10. For the foregoing reasons, to be explained in further detail below, Plaintiff seeks injunctive and monetary relief under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), and other applicable federal laws, statutes, and regulation; as well as state law breach of contract claims.

<u>THE PARTIES</u>

11. Plaintiff Doe is a natural person and citizen of the state of New Jersey.

12. Defendant MARIST College is a private institution of higher education located in Poughkeepsie, New York.


<u>JURISDICTION AND VENUE</u>

13. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the case arises under the laws of the United States, specifically, under Title IX of the Education Amendments of 1972, as well as diversity jurisdiction pursuant to 28 U.S.C. § 1332, as the parties are citizens of different states and the amount in controversy exceeds $75,000. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367, as the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

14. This Court has personal jurisdiction over Defendant MARIST on the grounds that it was, and still is, conducting business and principally located within the State of New York.

15. Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391.

16. Plaintiff uses the pseudonym "John Doe" due to the extreme sensitivity of the issues in this case, and will be making a motion for a court order allowing the case to continue under this pseudonym and be under seal of the court. Plaintiff is prepared to provide a statement of his name, state of residence, under seal, upon the Court's request.

17. In addition, MARIST is considered to reside in this judicial district and a substantial part of the acts or omissions giving rise to this action occurred in this judicial district.

18. On information and belief, MARIST, at all times relevant to this Complaint, received and continues to receive federal funding and is therefore subject to liability under Title IX of the Education Acts of 1972, 20 U.S.C. § 1681(a).

19. Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including Defendant MARIST.

<u>FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS</u>

<u>PROCEDURAL IRREGULARITIES</u>

20. The Decision and Sanctions dated July 5, 2024 were arbitrary and capricious and should be set aside and vacated as various unlawful procedural misconduct occurred by Marist's employees, agents, and representatives including, but not limited to, the Title IX Investigator Mr. William Meyer ("Meyer"), the Title IX Coordinator, Ms. Kelly Yough ("Yough"), and Ms. Kelli Campa, ("Campa"), the Chair appointed to make rulings and preside over the hearings, and who also had a vote in the determination of liability and sanctions.

21. These said individuals Meyer, Yough, and Campa, were at all times relevant herein, employees of the Defendant Marist College and were bias, discriminatory, negligent, not properly trained, and ignored and deviated from Marist College's own written policies regarding Title IX Procedures as well as federal law.

22. These said individuals Meyer, Yough, and Campa, at all times relevant herein, violated Title IX and federal law by denying Doe a fair and impartial hearing by their intentional and/or negligent bad acts and misconduct, and rush to judgment, not allowing exculpatory evidence to be presented to the hearing panel, all of which was designed and intended to make sure Doe did not have a fair hearing and would be prejudiced thereby and would be found liable for violations.

23. The defendant Marist College, by and through its employees and representatives, more specifically, said individuals Meyer, Yough, and Campa, knew, or should have known, and had notice, both actual and constructive, of the consequences and damages to Doe proximately caused by said individuals' unlawful deviation from Marist College's own procedures under Title IX, and violation of federal law.

24. In short, the individuals Meyer, Yough, and Campa, unlawfully deviated from, and did not follow, the Marist College handbook entitled, "Discrimination, Harassment, and Sexual Misconduct Policy and Procedures for All Students and Employees." Hereinafter, it will be referred to as the "Marist Policy."

25. Procedural irregularities and bias rendered the outcome of the matter illegally obtained, and said decision, determination, and sanctions, must be vacated and cancelled, and the appropriate money damages accessed against the defendant Marist College.

I.
Procedural Irregularity and Bias Regarding Questioning
of Title IX Investigator and Witnesses

26. Ms. Campa improperly reversed her own prior ruling at the hearing, thereby

precluding Doe's advisor to cross-examine the Title IX Investigator, William Meyer. The

questioning procedure provided at the Title IX hearings conducted on June 21, 2024, and June

24, 2024, substantially departed from the questioning procedure set forth in (a) the Marist Policy,

(b) written notices and directions from Ms. Kelly Yough, and most importantly (c) the ruling

made by Ms. Campa prior to the hearing that only questions to the reporting party had to be

submitted in writing and approved in advance of the hearing. That said departure resulted in Ms.

Campa taking away Doe's legal rights and precluding him from cross-examining the Investigator

Meyer, and resulted in an unlawful determination of responsibility and sanctions against Doe that

were both arbitrary and capricious and illegally obtained.

27. At page 25 of the Marist Policy it states:

> "During a Title IX hearing, it is the responsibility of the advisors to
> cross-examine the other party(ies) and witnesses.

28. At page 32 of the Marist Policy it states,

> "The Hearing Panel will then permit questioning of and by the
> parties, and of any present witness. All questions are subject to a
> relevance determination by the chair."

29. Similarly, in a letter to Doe dated June 6, 2024, from Ms. Yough, it states on the third

page,

> "Questioning will occur through your advisor. Advisors are
> permitted to directly pose questions to the other party and
> witnesses during cross-examination. The Hearing Chair will
> determine if a question is relevant and reserves the right to reword
> a question if needed. The Chair is permitted to request questions
> that you intend to ask the other party be sent in advance of the
> hearing date to determine relevance."

30. On June 17, 2024, during a telephone call, Ms. Campa, stated to Doe's advisor:

> "Ms. Yough just advised me that *only questions to the reporting party required the submission and approval of relevant questions in advance.*"

31.  Doe's advisor was informed by telephone on said date that questions to Investigator Meyer or any other witness did NOT require preapproval before the hearing and could be asked at the hearing subject to Ms. Campa's approval for relevance when it was asked.

32. Doe's advisor was reasonable to have relied upon the representation by Ms. Campa that only questions to the reporting party required the submission and approval of relevant questions in advance.

33. At the hearing on June 21, 2024, Title IX Investigator William Meyer testified against Doe.

34. However, it became immediately apparent that Ms. Campa was hellbent on shutting down Doe's advisor's questioning of Investigator Meyer.

35. Mr. Meyer made misleading statements and accusations to the panel that Doe's advisor wanted to bring to the attention of the panel.

36. Ms. Campa did not permit any questions about these discrepancies.

37. Then, out of nowhere, during the hearing, Ms. Campa states:

> "Len, I know that I did not approve some of these questions in your questions to the Reporting Party, so if I made it red in the questions to The Reporting Party just assume that it's also not gonna be approved to other people."

38. This is outrageous, as Ms. Campa arbitrarily, and without any authority, made a "new ruling" reversing and contradicting what she told Doe's advisor before the hearing. Ms. Campa further stated at the hearing:

> "It's a ruling that if it was already not approved for the
> complainant [the reporting party] it's not approved for other
> people."

39. At the hearing, Doe's advisor stated that the investigator is a different capacity than

the Reporting Party.

Ms. Campa, then stated at the hearing:

> "I'm just saying if I did not approve a question for you to ask to
> the Reporting Party it will not be approved for Bill [Mr. Meyer] . .
> ."

40. Ms. Campa precluded Doe's advisor from questioning the Title IX Investigator.

41. Ms. Campa, in mid-hearing, contradicts herself and what Ms. Yough advised her, and

all of a sudden required questions to the investigator and all persons to be the same as the

preapproved questions to the Reporting Party. Ms. Campa intentionally prejudiced Doe by

lumping questions to the Reporting Party, an interested party, with the same questions to Mr.

Meyer, an investigator who is purportedly an impartial party. Now, with the new ruling, even a

relevant question to the Title IX Investigator, or any witness, could not be asked unless it was

submitted in writing prior to the hearing and preapproved by the Chair, Ms. Campa.

42. Of course, Ms. Campa had also recklessly violated Marist's own Title IX policy by

giving no opportunity to submit questions in advance to the Title IX Investigator, or any other

witness, because the hearing had already begun.

43. It was a violation of Marist Policy, as well as being improper and unfair, to tell Doe's

advisor before the hearing that only questions to the reporting party required preapproval and

then to suddenly during the hearing impose that requirement to questions to Investigator Meyer

and all other witnesses.

44. Ms. Campa now precluded Doe's advisor from asking the investigator or any other person questions not preapproved for the reporting party, even if the questions were relevant.

45. This was an intentional effort on Ms. Campa's part to preclude Doe's advisor from questioning the investigator whose capacity was different from the reporting party in that he had gathered evidence, questioned witnesses, prepared and submitted to the hearing panel witness reports, some containing *exculpatory* statements regarding Doe's conduct.

46. Ms. Campa wrongfully precluded Doe's advisor from asking relevant questions to the Investigator, treating questions to the reporting party and to the investigator as the same.

47. By Ms. Campa's improper ruling, a relevant question to the investigator would not be approved because it wasn't preapproved for the reporting party, and this affected the outcome of the case because evidence in Doe's favor was not presented to the panel. Ms. Campa had willfully and intentionally precluded Mr. Meyer from answering questions at the hearing about exculpatory statements in the witness interview reports he prepared.

## II.
### Ms. Campa also engaged in procedural irregularity by not allowing Doe's advisor to question the Title IX Investigator about the witness interview statements he prepared, and instead directing him to ask the witnesses themselves knowing full well the morning of the hearing that those witnesses were not appearing and could not be questioned directly.

48. Ms. Campa also engaged in further procedural irregularity and bias at the hearing.

49. For example, Doe's advisor asked Mr. Meyer about the witness statement he took of "Professor Boylan" where it states, "He further stated he has not witnessed any concerning behavior between [Doe] and [the Reporting Party] in the past."

50. Ms. Campa did not approve this question telling Doe's advisor he can ask Professor Boylan "if he appears at the hearing." However, Ms. Campa *already knew the morning of the hearing that Mr. Boylan was not appearing and therefore she was purposefully denying Doe's advisor the opportunity to ask the investigator questions that would put before the panel testimony that was in Doe's favor.*

51. The same exact procedural irregularity applies to Ms. Jennifer Finn at the hearing. Doe's advisor questioned Mr. Meyer about Ms. Finn's statement:

Question: Did you ever witness any threatening behavior between [Doe] and [the Reporting Party] when they returned to campus?
Answer: No, I never saw any threatening behavior.
Doe's advisor asked Mr. Meyer if this was Ms. Finn's statement, and Ms. Campa did not approve the question, again reminding Doe's advisor that he could ask Ms. Finn at the hearing, *while Ms. Campa knew full well Ms. Finn was not appearing.*

52. This also applies to Ms. Finn's other statements in Doe's favor:

Question: Did you notice any concerning behavior between [Doe] and [the Reporting Party] on the trip?
Answer: They were very affectionate with one another. He always had his arm around her, but she seemed to like that, as she was smiling all the time as well.

Question: Did you ever hear him arguing with [the Reporting Party] in his room?
Answer: No, never heard [the Reporting Party] in his room. There was a time when he did not wake up in the morning (we had a 5am departure) and [the Reporting Party] was scolding him.

53. It was part of Doe's defense that while the [Reporting Party] was trying to portray herself as being controlled by Doe, the fact that she scolded Doe contradicted this portrayal of being afraid of Doe. Ms. Campa would not allow Doe's advisor to ask Mr. Meyer about these exonerating aspects in the report, again knowing full well Ms. Finn was not appearing and Doe's advisor would never get the opportunity to question her. That is why it was critical that Doe's advisor be allowed to ask Mr. Meyer about the contents of the interview reports he had prepared and submitted to the panel.

54. None of the testimony of Mr. Boylan and Ms. Finn that was in Doe's favor was mentioned in the decision, and Ms. Campa made sure (a) Mr. Meyer wouldn't mention anything in Doe's favor; and (b) no witness would appear that Doe's advisor could question.

55. For example, at the hearing, Ms. Campa did not approve questions about [the Reporting Party] scolding Doe, contradicting her portrayal of an abused victim who was submissive and being controlled.

56. At the hearing, Doe's advisor asked Mr. Meyer the reason [the Reporting Party] made a text to all the girls on the Greece trip, and Ms. Campa did not approve the question saying Doe's advisor can use Jennifer Finn and Sonia Roy. *Again, Ms. Campa knew Ms. Finn and Ms. Roy were not appearing at the hearing.*

### III.
### Ms. Campa violated Marist Policy
### by allowing only brief period of time to cross-examine Investigator Myer.

57.  Another procedural irregularity and act of bias of Ms. Campa is her only allowing Doe's advisor a brief period of time to cross-examine the Title IX Investigator, where Marist Policy has no time limits, and no time limits were mentioned by Ms. Campa. Out of nowhere, Ms. Campa arbitrarily stopped Doe's advisor from proceeding with the cross-examination of Investigator Meyer. Mr. Campa violated Marist Policy by allowing Doe's advisor only a brief period of time to cross-examine the Investigator who gathered all the evidence, questioned witnesses, and prepared witness statements.

58. Out of nowhere, Ms. Campa makes the following ruling at the hearing:

> "Um Len I'm gonna give you 2 more questions as the ten minutes have been up because we do need to move on from the investigator."

59. Only a brief period of time was allowed by Ms. Campa to cross-examine the investigator. This is in contravention of Marist Policy allowing cross-examination of witnesses. Ms. Campa's reasoning for cutting short the cross-examination was "we have to move on from the investigator" and NOT that Doe's advisor's questions were not relevant. Clearly, Ms. Campa was in a rush to get this matter over with since she had already made her decision about Doe before the hearing was even over, but Doe's advisor was not finished with the questioning of the investigator. Moreover, there is nothing in the notices sent by Ms. Yough, or the Marist Title IX Policy itself, putting time limits on segments of the hearing process. The fact that the hearing went on to a second day clearly shows that there was time for Doe's advisor to further cross-examine Mr. Meyer, as the second hearing started at 9 am and ended a few hours later.

IV.
Ms. Campa's various rulings violated not only Marist Policy, but also Federal Law.

60. The Marist Policy must comply with federal law 34 CFR 106.45 (b) (6) (i), which entitles,

> "each party's advisor to conduct live cross-examination of the other party or parties and witnesses . . . in real time."

61. The United States Supreme Court has recognized that the right to ask questions of an accuser or witness is a significant and critical right," (A.E., 173 AD3d at 1755; see generally Chambers v. Mississippi, 410 US 284, 295 [1973]). See In the Matter of Doe 1, Petitioner v. State University of New York at Buffalo, Respondent. Appellate Division, Fourth Judicial Dept. Index 807735/2022.

62. Inasmuch as Ms. Campa violated the Marist Policy during the hearing itself by suddenly and arbitrarily precluding Doe's advisor from asking questions of the investigator and witness, when she had previously ruled and directed that pre-approval was not required except for the Reporting Party, shows a bias and unlawful disregard for Doe's rights to cross-examine witnesses and denied Doe due process under the law. Ms. Campa made sure that any testimony

Doe could have presented at the hearing in Doe's favor through the investigator who had questioned witnesses and prepared summaries of witness interview statements would not be presented to the panel.

63. Also, as far as the questions Doe's advisor presented to Ms. Campa with respect to the reporting party, Ms. Campa precluded half the questions, most of which were relevant. There were many questions and they were arbitrarily precluded, as they related directly to allegations against Doe.

64. Ms. Campa also precluded Doe from presenting exculpatory evidence to the panel at the hearing.

V.

An anonymous report was Appendix C in the Final Report and was not credible, relevant, or reliable, and was inflammatory and prejudicial and used by Mr. Myer and Ms. Yough in violation of Marist Policy.

65. At page 30 of the Marist Policy it states,

> "Any evidence that is relevant and credible may be considered, including an individual's prior misconduct history as well as evidence indicating a pattern of misconduct. The process should exclude irrelevant or immaterial evidence and may disregard evidence lacking in credibility or that is improperly prejudicial."

66. As Appendix C of the FINAL REPORT, Mr. Meyer produced an anonymous report from November, 2022. This was approved by Ms. Yough. It mentioned "sex trafficking" and that "[she] would follow [Doe] around and appeared timid" and there were "bruises on legs."

67. Although Doe's advisor objected in writing to this anonymous report prior to the hearing, Mr. Meyer presented it to the panel, and it was used and referred to in the Decision. Mr. Myer and Ms. Yough allowed the anonymous statement despite that fact that *nowhere in the Reporting Party's interview statement or testimony did she allege sex trafficking, or that she followed [Doe] around and was timid, or that she had bruises on legs.* Investigator Myer admits

at the hearing that the only injuries were a bruise on the wrist and a pinch on the back. The

unfairness and prejudice of the anonymous statement is also highlighted by the fact that there is

no witness to cross-examine.

68. Although the anonymous report was not relevant and not credible it was used in the

decision, and thus the decision and sanctions were illegally derived and obtained and must be

vacated and cancelled.

## VI.
### Mr. Myer and Ms. Yough improperly included in the Final Report as an Appendix a court order of protection that was highly inflammatory and prejudicial and violated Marist Policy.

69. Another example of procedural irregularity is the use of a prior court record brought

by the Reporting Party at the same time she filed the Title IX report. Despite Doe's written

objection, Mr. Myer also put in the FINAL REPORT as Appendix I the court order of protection

from the Dutchess County Family Court despite the Marist Policy at page 22 where it states,

> "No one will present information or raise questions of either the
> Complainant or Respondent concerning:
>
> "Past finding of domestic violence, dating violence, stalking,
> sexual assault, or other policy violations . . . "

70. Although the prior court order was entered into voluntarily by the parties, without any

admission of liability on Doe's part, and no hearing or findings of facts against Doe, the mere

fact that there was an order of protection against Doe was inflammatory, prejudicial, and

improper.

71. This protective order should never have been presented to the panel in the Report and

used against Doe because the panel could presume there must have been a reason for a court

order to be imposed. This is a violation of Marist Policy.

<u>VII.</u>
<u>Mr. Myer also violated Marist Policy be not interviewing the only witness Doe requested.</u>

72.  Mr. Meyer purposefully did not interview the only witness Doe asked him to interview. In Doe's email to Mr. Meyer and Ms. Yough, dated May 30, 2024, it states:

> "In addition, as discussed, I respectfully request that you conduct an interview of Mr. X, a pseudonym, and I gave his email and telephone number. You were given this request and this information at my April 20, 2024 interview."

73. Looking at Appendix A1, the Final Investigative Report, at page 5 is a spreadsheet of the witnesses Mr. Meyer interviewed. In the bottom first column it states: Witness: Mr. X (spelled incorrectly), and to the right "Interview request sent 5/1/24 Via Maxient" and Interview 2nd Request 5/8/24."  However, Doe asked Mr. Meyer again on May 30, 2024, with plenty of time before the hearing, and he never made a request, and he only made the last request on 5/8/24, even after Doe provided him with Mr. X's Marist email and telephone number. Mr. Meyer never informed Doe that Mr. X would not be interviewed and allowed to give testimony at the hearing. Had this witness statement been taken, Mr. X could have testified on Doe's behalf, and this was intentionally done to prejudice Doe.

<u>VIII.</u>
<u>In violation of Marist Policy, Mr. Myer and Ms. Yough called Doe into the Title IX office and discussed the report without Doe's advisor present.</u>

74. Further, procedural irregularities occurred at Doe's very first meeting upon receiving the Title IX Letter. Doe was called in to their Title IX office. Mr. Meyer and Ms. Yough told Doe that he did not have to talk with them, but nevertheless they both misled Doe into talking about the report. Ms. Yough pretended to be concerned about Doe saying, "How do you feel." Both Mr. Myer and Ms. Yough had Doe talking about the report, and they were all laughing

about things, such as popping pimples, and other aspects of the report, making Doe feel that they both agreed with Doe and that Doe had nothing to worry about. This conversation lasted for over 30 minutes without an advisor or an attorney present. This violated Marist Policy, and everything discussed was used against Doe.

IX
Accommodations disregarded.

75. Procedural irregularities and bias also occurred regarding Accommodations, which Doe had on file with the Marist College Office of Accommodations and Accessibility. On June 19, 2024, Doe's advisor informed Ms. Campa and Ms. Yough that Doe was seeking Accommodations and that the Director of the Office of Accommodations and Accessibility would be contacting Title IX. Both Ms. Yough and Ms. Campa were aware of said accommodations being in place prior to the hearing. Ms. Campa was reminded at the hearing that Doe had Accommodations for this Hearing. During the first day of hearings, there was no lunch break and very few breaks given. On June 24, 2024, the second day of the hearing, at the hearing, after The Reporting Party had finished her closing statement which was very difficult, painful, and upsetting to hear, Doe asked:

> "Would it be possible for me to get a 5 minute break just to digest her closing statement."

76. Ms. Campa, in violation of Accommodations and Accessibility regulations, denied Doe's request. That Ms. Campa did not grant a 5 minute break at a very sensitive and crucial time in the hearing, show's Campa's bias against Doe, and is a violation of the law provided for those who require and are authorized to request accommodations. This affected Doe's ability to participate effectively in the hearing, and in his own defense.

X.
Punishment disregarding protected disability and not considering impact statement.

77. Doe also advised Ms. Yough prior to the hearing that Doe was diagnosed with

Anxiety and ADHD. This was not considered by Meyer, Yough, or Campa, or the hearing panel.

Prior to the hearing, Doe provided a letter from his treating physician that was utterly ignored.

Said letter stated Doe was compliant with his treatment since December of 2023, and was not a

threat to anyone, himself, or the Reporting Party, and had no intention of contacting the

Reporting Party. The harsh sanctions imposed with defendant Marist College's knowledge and

notice of Doe's diagnosis/prognosis, and no prior record or determination of abusing anyone,

was arbitrary and capricious, and violated federal law and the protections given to those similarly

situated, and Marist College's own Title IX procedures.

78. In short, having notice of Doe's medical disability, Marist College punished him

nonetheless, and this violated federal law.


XI.
The Defendant intentionally had the hearings scheduled after the semester was over, when
professors would be off campus, on vacation, or otherwise less likely to participate in the
hearing.


79. The Defendant was required to conduct the hearing within a certain time from the

filing of the complaint.

80. The timing of the hearings *after* the semester was over was intentionally designed by

Meyer, Yough, and Campa, to make any defense of the matter by questioning the Investigator

and other witnesses impossible, the most fundamental of rights.

81. To add insult to injury, Ms. Campa precluded Doe's advisor from questioning Mr.

Meyer, the Title IX investigator, regarding the exculpatory statements in the witness interview

reports he had prepared for the hearing, and Campa knew that no witnesses would be appearing for Doe's advisor to question directly.

XII.
 Marist College had a duty to keep its students safe from harm, pain and suffering, mental duress, and extreme psychological damage.

82. Marist College, through its various employees, agents, and representatives including, but not limited to, Meyer and Yough, had knowledge, and notice, that a protective order was in place.

83. Marist College had a duty to keep its matriculated students safe and free from harm, pain and suffering, mental duress, and extreme psychological damage, including the plaintiff Doe.

84. Marist College should have created a written schedule on notice to both the Reporting Party and Doe whereby Doe and the Reporting Party could utilize the Steel Plant facility on Marist Property (where fashion major students gather to do their work) at difference dates and times so that they would not meet.

85. Marist College, its various employees including, but not limited to, Meyer and Yough, breached its duty to keep its students safe from harm, pain and suffering, mental duress, personal injury, and extreme psychological damage, by negligently failing to create a schedule by which Doe and the Reporting Party could use and utilize the Steel Plant at different dates and times and not meet each other. (Doe's tuition was paid in full and he had the right to utilize the Steel Plant facility to do his work.)

86. It was foreseeable to Marist College, its various employees including, but not limited to, Meyer and Yough, that since both Doe and the Reporting Party were fashion majors, they would unintentionally and/or randomly meet at the Steel Plant facility, and that the Reporting

Party would call the police pursuant to the aforesaid protective order, and that the plaintiff Doe would suffer harm, pain and suffering, mental duress, and extreme psychological damage.

87. The very next day, after the family court order was finalized on April 25, 2024, while Doe was peacefully at the Steel Plant to do his work, as was foreseeable by the defendant Marist College, through its employees, representatives, and agents including, but not limited to, Meyer and Yough, the Reporting Party called the police and 3 police cars arrived.

88. It was extremely traumatic as Doe had never in his life been approached by the police. And this was at Doe's school, in front of Doe's peers and professors. The police and campus security questioned Doe and being satisfied Doe did not violate the protective order, no further action was taken.

89. To date, there is no determination by the Dutchess County Family Court or the police that Doe violated the protective order in any manner whatsoever.

90. Only after the traumatic incident mentioned above occurred did Marist College create a schedule, but it was already too late.

91. Doe suffered, and continues to suffer, severe emotion distress and psychological damage which required, and continues to require, medical attention as a proximate cause of Marist College's negligence.

## XIII.
Doe was otherwise bullied, harassed, humiliated, unduly reprimanded, by Marist College, through its various employees, Meyer, Yough, and Campa, and Doe was caused to suffer extreme emotional suffering, duress, fear, and psychological trauma and damage.

92. Doe was also the recipient of reverse gender-discrimination by Marist College, through its various employees, Meyer, Yough, and Campa, more specifically in that if the

reporting party engaged in similar conduct alleged against Doe, it was minimized, ignored, not acknowledged, and various bias and discriminatory rulings with respect to the hearing were improperly in favor of the reporting party and against Doe.

93. Meyer, Yough, and Campa, were bias and discriminatory against Doe, and felt they could do anything to Doe, that they were above the law, with Meyer reminding Doe and his Advisor that "the hearing is not a courtroom," including violating Marist's own Title IX policies.

94. As a proximate cause of the misconduct aforementioned of Marist College, through its employees, agents, and representatives, including Meyer, Yough, and Campa, Doe sustained, and continues to sustain, serious psychological trauma, stress, duress, depression, which required, and continues to require, medical treatment and attention.

*** *** ***

## AS AND FOR A FIRST CAUSE OF ACTION

95. Plaintiff Doe repeats and realleges each and every allegation in paragraphs "1" through "94" hereof as if same were fully set forth herein at length.

96. Defendant violated Title IX is of the Education Amendments of 1972.

97. The Defendant Marist College, by and through its employees, representatives, and agents including, but not limited to, Meyer, Yough, and Campa, had a duty and obligation to follow its own Marist Title IX Procedures when conducting the hearing on the issue of "dating abuse" against the Plaintiff Doe.

98. Because Marist College breached said duty by conducting a hearing with prejudicial procedural irregularities, in violation of Marist College's own Title IX Procedures, as well as Federal Law, the decision and sanctions against Doe were obtained illegally and/or improperly, and in contravention of Title IX Law.

99. The procedural irregularities of Marist College, by and through its employees, representatives, and agents including, but not limited to, Meyer, Yough, and Campa, throughout the course of its investigation and the hearing conducted, are more specifically set forth above, but are summarized as follows:

(a) precluded plaintiff from questioning the Title IX Investigator; (b) precluded plaintiff from asking relevant questions to the Reporting Party; (c) put into evidence an unreliable, irrelevant, and highly inflammatory "anonymous report" with no witness to cross-examine; (d) improperly put into evidence a Family Court protective order; (e) granted no accommodations as arranged prior to the hearing with the Marist College Office of Accommodations and Accessibility; (f) Meyer refused to interview the only witness Doe requested; (g) Meyer and Yough met with Doe without advisor or attorney present; (h) Meyer and Yough and Campa punished plaintiff despite having prior knowledge and notice of his medical diagnosis/prognosis provided by his treating physician, and otherwise disregarded the protections under federal law afforded to those similarly situated; (i) Campa arbitrarily reversed rulings to intentionally prejudiced Doe; (j) Campa precluded the Investigator Meyer to be questioned about the interview reports he had conducted and prepared and that contained exculpatory evidence in Doe's favor; (k) not allowing Doe to submit any evidence directly to the hearing panel at the hearing; (l) Campa arbitrarily and without cause severely restricted the time for Doe to question the Title IX Investigator; (m) Campa reminding Doe's advisor that he could question the witnesses directly knowing none were appearing; and (n) and otherwise in deviating from Marist College's own Title IX Policy;  (o) denying Doe's federal rights to due process; and (p) not allowing evidence to be presented to the hearing panel.

100. As a result of the foregoing, Plaintiff is entitled to money damages in an amount to be determined at trial, but in no event less than $2,000,000.00, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as the following money damages, injunctive relief, and declaratory judgment, against the defendant Marist College:

(i) a declaratory judgment vacating and cancelling and/or otherwise reversing the decision and sanctions against the plaintiff Doe; and

(ii) a declaratory judgment expunging and removing from the plaintiff Doe's Marist College transcript and disciplinary record any negative notations and or findings regarding the reporting party's complaint, and otherwise removing any negative notations forthwith; and

(iii) reinstating the plaintiff Doe back into Marist College forthwith; and

(iv) the return of all monies paid by Doe to the College to date; and

(v) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and

(vi) any and all further actions required to return Plaintiff to the status quo ante; and

(vii) money damages for lost college, career, and job opportunities, in an amount to be determined by this Court, but in no event less than $2,000,000.00; and

(viii) money damages for loss of financial aid, grants, and/or scholarships, and in having to pay more money for college and housing; and

(ix) money damages for pain and suffering for the psychological stigma of "dating abuser;" and

(x) money damages for wrongfully tarnishing plaintiff Doe's college transcript and reputation and cause loss of income and loss of future income; and

(xi) judgment to recover medical fees and payments for treatment proximately attributable to said breach; and

(xii) for whatever other and further relief the court deems appropriate under the circumstances.

<u>AS AND FOR A SECOND CAUSE OF ACTION</u>

101. Plaintiff Doe repeats and realleges each and every allegation in paragraphs "1" through "100" hereof as if same were fully set forth herein at length.

102. At all times relevant hereto, a contractual relationship existed between MARIST and Plaintiff by virtue of Plaintiff's enrollment at MARIST and as defined by and through MARIST's policies and procedures governing and student disciplinary system, including but not limited to its Title IX Policy.

103. Through the documents it publishes and provides to students, MARIST makes express and implied contractual commitments to students involved in the disciplinary process and/or the investigation of potential violations of the Title IX Policy.

104. New York law recognizes that the relationship between a student and a college is contractual in nature, and that the terms of the said Marist College handbook entitled, *"Discrimination, Harassment, and Sexual Misconduct Policy and Procedures for All Students and Employees"* ("Marist Policy"), become part of that contract. <u>See</u> <u>Vought v. Teachers Coll., Columbia Univ.,</u> 511 N.Y.S.2d 880, 881 (2d Dep't 1987); <u>Xiaolu Peter Yu v. Vassar Coll.,</u> 97 F. Supp. 3d 448, 481 (S.D.N.Y. 2015).

105.  Implied in every contract is the covenant of good faith and fair dealing. <u>See</u> <u>Wood v. Lucy, Lady Duff-Gordon</u>, 222 N.Y. 88 (1917).

106. Based on the aforementioned facts and circumstances, MARIST created express and implied contracts when it offered, and Plaintiff accepted, admissions to MARIST, and when Plaintiff paid the required tens of thousands of dollars in tuition and fees.

107. The Defendant Marist College, by and through its employees, representatives, and agents including, but not limited to Meyer, Yough, and Campa, had a duty and obligation to follow the contract terms and its own Marist Title IX Procedures with respect to evidence it presented and the procedures when conducting the hearing on the issue of "dating abuse" against the Plaintiff Doe, and to otherwise treat the Plaintiff fairly and properly in the application of said Title IX Procedures, and relevant Federal Law.

108. Because Marist College breached said duty by conducting a hearing with various serious and highly prejudicial procedural irregularities, as set forth above, in violation of Marist College's own Title IX Procedures, as well as Federal Law, the decision and sanctions against Doe were obtained illegally and/or improperly, and in contravention of Title IX Law, and therefore said decision and sanctions must be vacated and cancelled, and any notation from Doe's transcript removed forthwith, and Doe must be reinstated to Marist College forthwith.

109. Further, Marist College breached its contractual duty to plaintiff by failing in an intentional, and/or reckless, and/or negligent manner, and/or bias and discriminatory manner, to apply its very own Title IX Procedures when it brought its Title IX case against the Plaintiff Doe.

110. The contractual breaches of Marist College, by and through its employees, representatives, and agents including, but not limited to, Meyer, Yough, and Campa, throughout the course of its investigation and the hearing conducted, are more specifically set forth above, but are summarized as follows:

(a) precluded plaintiff from questioning the Title IX Investigator; (b) precluded plaintiff from asking relevant questions to the Reporting Party; (c) put into evidence an unreliable, irrelevant, and highly inflammatory "anonymous report" with no witness to cross-examine; (d) improperly put into evidence a Family Court protective order; (e) granted no accommodations as arranged prior to the hearing with the Marist College Office of Accommodations and Accessibility; (f) Meyer refused to interview the only witness Doe requested; (g) Meyer and Yough met with Doe without advisor or attorney present; (h) Meyer and Yough and Campa punished plaintiff despite having prior knowledge and notice of his medical diagnosis/prognosis provided by his treating physician, and otherwise disregarded the protections under federal law afforded to those similarly situated; (i) Campa arbitrarily reversed rulings to intentionally prejudiced Doe; (j) Campa precluded the Investigator Meyer to be questioned about the interview reports he had conducted and prepared and that contained exculpatory evidence in Doe's favor; (k) not allowing Doe to submit any evidence directly to the hearing panel at the hearing; (l) Campa arbitrarily and without cause severely restricted the time for Doe to question the Title IX Investigator; (m) Campa reminding Doe's advisor that he could question the witnesses directly knowing none were appearing; and (n) and otherwise in deviating from Marist College's own Title IX Policy; (o) denying Doe's federal rights to due process; and (p) not allowing evidence to be presented to the hearing panel.

111. By Marist College's breach of the contractual agreement, plaintiff Doe sustained various and serious damages.

112. This above-described unlawful breach of contract proximately caused Doe to sustain substantial injury, damage, and loss, including, but not limited to: emotional distress, psychological damages, loss of education, loss of future educational and career opportunities,

reputational damages, economic injuries, monetary loss, and other direct and consequential damages.

113. As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, but in no event less than $2,000,000.00, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as following money damages, injunctive relief, and declaratory judgment, against the defendant Marist College:

(i) a declaratory judgment vacating and cancelling and/or otherwise reversing the decision and sanctions against the plaintiff Doe; and

(ii) a declaratory judgment expunging and removing from the plaintiff Doe's Marist College transcript and disciplinary record any negative notations and or findings regarding the reporting party's complaint, and otherwise removing any negative notations forthwith; and

(iii) reinstating the plaintiff Doe back into Marist College forthwith; and

(iv) the return of all monies paid by Doe to the College to date; and

(v) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and

(vi) any and all further actions required to return Plaintiff to the status quo ante; and

(vii) money damages for lost college, career, and job opportunities, in an amount to be determined by this Court, but in no event less than $2,000,000.00; and

(viii) money damages for loss of financial aid, grants, and/or scholarships, and in having to pay more money for college and housing; and

(ix) money damages for pain and suffering for the psychological stigma of "dating abuser;" and

(x) money damages for wrongfully tarnishing plaintiff Doe's college transcript and reputation and cause loss of income and loss of future income; and

(xi) judgment to recover medical fees and payments for treatment proximately attributable to said breach; and

(xii) for whatever other and further relief the court deems appropriate under the circumstances.

<u>AS AND FOR A THIRD CAUSE OF ACTION</u>

114. Plaintiff Doe repeats and realleges each and every allegation in paragraphs "1" through "113" hereof as if same were fully set forth herein at length.

115. Title IX of the Education Amendments of 1972 provides, in relevant part, that:

> "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

116. On information and belief, MARIST, at all times relevant to this Complaint, received and continues to receive federal funding and is therefore subject to liability under Title IX of the Education Acts of 1972, 20 U.S.C. § 1681(a).

117. Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including Defendant MARIST.

118. Title IX is enforceable through a private right of action, for monetary damages as well as injunctive relief.

119. Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline. <u>Yusuf v. Vassar Coll.</u>, 35 F.3d 709, 715 (2d Cir. 1994).

120. MARIST applied its policies and procedures in a manner that discriminated against Doe on the basis of his sex and led to an erroneous outcome.

121. MARIST also imposed an unwarranted and unjustly severe sanction on Doe, and gender bias was a motivating factor.

122. Based on the foregoing, Doe was subjected to a biased, prejudiced and unfair process in violation of Title IX designed to find him, the male, responsible for dating abuse and punish him severely for it.

123. This unlawful discrimination in violation of Title IX proximately caused Doe to sustain substantial injury, damage, and loss, including, but not limited to: emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

124. As a result of the foregoing, Plaintiff Doe is entitled to a judgment awarding John Doe damages in an amount to be determined at trial, but in no event less than $2,000,000.00, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as the following money damages, injunctive relief, declaratory judgment, against the defendant Marist College:

(i) a declaratory judgment vacating and cancelling and/or otherwise reversing the decision and sanctions against the plaintiff Doe; and

(ii) a declaratory judgment expunging and removing from the plaintiff Doe's Marist College transcript and disciplinary record any negative notations and or findings regarding the reporting party's complaint, and otherwise removing any negative notations forthwith; and

(iii) reinstating the plaintiff Doe back into Marist College forthwith; and

(iv) the return of all monies paid by Doe to the College to date; and

(v) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and

(vi) any and all further actions required to return Plaintiff to the status quo ante; and

(vii) money damages for lost college, career, and job opportunities, in an amount to be determined by this Court, but in no event less than $2,000,000.00; and

(viii) money damages for loss of financial aid, grants, and/or scholarships, and in having to pay more money for college and housing; and

(ix) money damages for pain and suffering for the psychological stigma of "dating abuser;" and

(x) money damages for wrongfully tarnishing plaintiff Doe's college transcript and reputation and cause loss of income and loss of future income; and

(xi) judgment to recover medical fees and payments for treatment proximately attributable to said breach; and

(xii) for whatever other and further relief the court deems appropriate under the circumstances.

<u>AS AND FOR A FOURTH CAUSE OF ACTION</u>

125. Plaintiff Doe repeats and realleges each and every allegation in paragraphs "1" through "124" hereof as if same were fully set forth herein at length.

126. At all times relevant hereto, a contractual relationship existed between MARIST and Plaintiff by virtue of Plaintiff's enrollment at MARIST and as defined by and through MARIST's policies and procedures governing and student disciplinary system, including but not limited to its Title IX Policy.

127. Implied in every contract is the covenant of good faith and fair dealing. <u>See</u> <u>Wood v. Lucy, Lady Duff-Gordon</u>, 222 N.Y. 88 (1917).

128. Based on the aforementioned facts and circumstances, MARIST created express and implied contracts when it offered, and Plaintiff accepted, admissions to MARIST, and when Plaintiff paid the required tens of thousands of dollars in tuition and fees.

129. MARIST further violated the covenant of good faith and fair dealing by purporting to provide Plaintiff with a fair process, but in actuality endeavoring to find Plaintiff responsible and punish him to the utmost degree and violating its very own Marist Title IX Procedure to do so.

130. MARIST further violated the covenant of good faith and fair dealing by and through its employees, representatives, and agents including, but not limited to, Meyer, Yough, and Campa, throughout the course of its investigation and the hearing conducted, as follows:

(a) precluded plaintiff from questioning the Title IX Investigator; (b) precluded plaintiff from asking relevant questions to the Reporting Party; (c) put into evidence an unreliable, irrelevant, and highly inflammatory "anonymous report" with no witness to cross-examine; (d) improperly put into evidence a Family Court protective order; (e) granted no accommodations as arranged prior to the hearing with the Marist College Office of Accommodations and Accessibility; (f) Meyer refused to interview the only witness Doe requested; (g) Meyer and Yough met with Doe without advisor or attorney present; (h) Meyer and Yough and Campa punished plaintiff despite having prior knowledge and notice of his medical diagnosis/prognosis provided by his treating physician, and otherwise disregarded the protections under federal law afforded to those similarly situated; (i) Campa arbitrarily reversed rulings to intentionally prejudiced Doe; (j) Campa precluded the Investigator Meyer to be questioned about the interview reports he had conducted and prepared and that contained exculpatory evidence in Doe's favor; (k) not allowing Doe to submit any evidence directly to the hearing panel at the

hearing; (l) Campa arbitrarily and without cause severely restricted the time for Doe to question the Title IX Investigator; (m) Campa reminding Doe's advisor that he could question the witnesses directly knowing none were appearing; and (n) and otherwise in deviating from Marist College's own Title IX Policy; (o) denying Doe's federal rights to due process; and (p) not allowing evidence to be presented to the hearing panel.

131. During the Investigation and the Hearing, Marist College, by its employees, representatives, and agents including, but not limited to, Meyer, Yough, and Campa, engaged in procedural irregularities deviating from Marist's Title IX Policy, so hellbent on a finding of liability on the part of plaintiff Doe.

132. As a proximate and foreseeable consequence of the foregoing breaches, Plaintiff sustained damages, including, but not limited to, emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

133. As a result of the foregoing, Plaintiff Doe is entitled to a judgment awarding John Doe damages in an amount to be determined at trial, but in no event less than $2,000,000.00, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as the following money damages, injunctive relief, declaratory judgment, against the defendant Marist College:

(i) a declaratory judgment vacating and cancelling and/or otherwise reversing the decision and sanctions against the plaintiff Doe; and

(ii) a declaratory judgment expunging and removing from the plaintiff Doe's Marist College transcript and disciplinary record any negative notations and or findings regarding the reporting party's complaint, and otherwise removing any negative notations forthwith; and

(iii) reinstating the plaintiff Doe back into Marist College forthwith; and

(iv) the return of all monies paid by Doe to the College to date; and

(v) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and

(vi) any and all further actions required to return Plaintiff to the status quo ante; and

(vii) money damages for lost college, career, and job opportunities, in an amount to be determined by this Court, but in no event less than $2,000,000.00; and

(viii) money damages for loss of financial aid, grants, and/or scholarships, and in having to pay more money for college and housing; and

(ix) money damages for pain and suffering for the psychological stigma of "dating abuser;" and

(x) money damages for wrongfully tarnishing plaintiff Doe's college transcript and reputation and cause loss of income and loss of future income; and

(xi) judgment to recover medical fees and payments for treatment proximately attributable to said breach; and

(xii) for whatever other and further relief the court deems appropriate under the circumstances.

<u>AS AND FOR A FIFTH CAUSE OF ACTION</u>

134. Plaintiff Doe repeats and realleges each and every allegation in paragraphs "1" through "133" hereof as if same were fully set forth herein at length.

135. Defendant MARIST is an educational corporation and operating as such under the state laws of New York.

136. The New York State Human Rights Law § 296(4) provides

> "[i]t shall be an unlawful discriminatory practice for an education corporation or association ... to permit the harassment of any student or applicant, by reason of his race, color, religion, disability, national origin, sexual orientation, military status, sex, age, or marital status[.]" N.Y. Exec. Law § 296(4).

137. The Marist Policy sets for the procedures by which the investigation, hearings, and adjudication, of Title IX violations will be handled by the college.

138. Marist is required to coordinate the College's efforts to comply with and carry out its responsibilities under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq., and related regulations issued by the U.S. Department of Education in May 2020, 34 C.F.R., Part 106 ("May 2020 Title IX regulations") to implement Title IX, which prohibit sex discrimination in all of the College's programs and activities, as well as retaliation for the purpose of interfering with any right or privilege secured by Title IX or the May 2020 Title IX regulations.

139. Based on the foregoing, Marist College, by its employees, representative, and agents including, but not limited to Meyer, Yough, and Campa, permitted discrimination against Plaintiff Doe on the basis of his sex.

140. Based on the foregoing, MARIST, by its employees, representatives, and agents including, but not limited to, Meyer, Yough, and Campa, authorized, condoned, and/or acquiesced to discriminatory conduct against Plaintiff including, but not limited, to the following:

(a) precluded plaintiff from questioning the Title IX Investigator; (b) precluded plaintiff from asking relevant questions to the Reporting Party; (c) put into evidence an unreliable, irrelevant, and highly inflammatory "anonymous report" with no witness to cross-examine; (d)

improperly put into evidence a Family Court protective order; (e) granted no accommodations as arranged prior to the hearing with the Marist College Office of Accommodations and Accessibility; (f) Meyer refused to interview the only witness Doe requested; (g) Meyer and Yough met with Doe without advisor or attorney present; (h) Meyer and Yough and Campa punished plaintiff despite having prior knowledge and notice of his medical diagnosis/prognosis provided by his treating physician, and otherwise disregarded the protections under federal law afforded to those similarly situated; (i) Campa arbitrarily reversed rulings to intentionally prejudiced Doe; (j) Campa precluded the Investigator Meyer to be questioned about the interview reports he had conducted and prepared and that contained exculpatory evidence in Doe's favor; (k) not allowing Doe to submit any evidence directly to the hearing panel at the hearing; (l) Campa arbitrarily and without cause severely restricted the time for Doe to question the Title IX Investigator; (m) Campa reminding Doe's advisor that he could question the witnesses directly knowing none were appearing; and (n) and otherwise in deviating from Marist College's own Title IX Policy;  (o) denying Doe's federal rights to due process; and (p) not allowing evidence to be presented to the hearing panel.

141. MARIST, its employees, representatives, and agents including, but not limited to, Meyer, Yough, and Campa, knew or should have known, and had both actual and constructive notice, of such discriminatory conduct and failed to undertake action to prevent it.

142. Written objections by Doe to Meyer, Yough, and Campa, prior to the hearing were ignored, dismissed, not validated, given no importance, and Doe and his advisor were reminded by Meyer that "this was not a court of law" because they (Meyer, Yough, and Campa) thought they could do whatever they wanted even violating the college's own Marist Title IX policy.

143. In fact, with respect to preserving issues for appeal, in an email dated June 20, 2024, from Yough to Doe, Ms. Yough states:

> " . . . no, neither party will have the opportunity to preserve issues
> for appeal at any point in a college hearing process."

144. In short, Defendant MARIST, by its employees, representatives, and agents including, but not limited to, Meyer, Yough, and Campa, ran roughshod over Doe's due process rights, and engaged in heavy-handed, discriminatory acts and practices against Doe, as the male accused, and subjected Plaintiff to disciplinary action in an arbitrary and capricious way, and in discrimination against him on the basis of his gender.

145. MARIST failed to adhere to its Policy; the decision of responsibility was discriminatory in that it was illegally obtained through procedural irregularities that made it impossible for Doe to defend himself at the purported hearing.

146. Based on the foregoing facts and circumstances, MARIST engaged in unlawful, discriminatory practices in violation of N.Y. Exec. Law § 296(4). 259. As a direct and proximate consequence of the foregoing breaches, Plaintiff sustained damages, including, but not limited to, emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries, and other direct and consequential damages, and was put to medical costs and expenses.

147. As a result of the foregoing, Plaintiff Doe is entitled to a judgment awarding John Doe damages in an amount to be determined at trial, but in no event less than $2,000,000.00, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as the following money damages, injunctive relief, declaratory judgment, against the defendant Marist College:

(i) a declaratory judgment vacating and cancelling and/or otherwise reversing the decision and sanctions against the plaintiff Doe; and

(ii) a declaratory judgment expunging and removing from the plaintiff Doe's Marist College transcript and disciplinary record any negative notations and or findings regarding the reporting party's complaint, and otherwise removing any negative notations forthwith; and

(iii) reinstating the plaintiff Doe back into Marist College forthwith; and

(iv) the return of all monies paid by Doe to the College to date; and

(v) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and

(vi) any and all further actions required to return Plaintiff to the status quo ante; and

(vii) money damages for lost college, career, and job opportunities, in an amount to be determined by this Court, but in no event less than $2,000,000.00; and

(viii) money damages for loss of financial aid, grants, and/or scholarships, and in having to pay more money for college and housing; and

(ix) money damages for pain and suffering for the psychological stigma of "dating abuser;" and

(x) money damages for wrongfully tarnishing plaintiff Doe's college transcript and reputation and cause loss of income and loss of future income; and

(xi) judgment to recover medical fees and payments for treatment proximately attributable to said breach; and

(xii) for whatever other and further relief the court deems appropriate under the circumstances.

<u>AS AND FOR SIXTH CAUSE OF ACTION</u>

148. Plaintiff Doe repeats and realleges each and every allegation in paragraphs "1"

through "147" hereof as if same were fully set forth herein at length.

149. Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et. seq., provides,

in relevant part:

> "No person in the United States shall, on the basis of sex, be
> excluded from participation in, be denied the benefits of, or be
> subjected to discrimination under any education program or
> activity receiving Federal financial assistance."

150. Title IX applies to all public and private educational institutions that receive federal

funding, which includes Defendant MARIST.

151. In this case, a Plaintiff can challenge a university disciplinary outcome by asserting

that regardless of the student's guilt or innocence, the severity of the penalty and/or decision to

initiate the proceeding was affected by the student's gender.

152. For a selective enforcement claim, a male plaintiff

> "must demonstrate that a female was in circumstances sufficiently
> similar to his own and was treated more favorably by the
> University..." and that the "University's actions against [the male
> plaintiff] were motivated by his gender and that a similarly situated
> woman would not have been subjected to the same disciplinary
> proceedings." <u>Xiaolu Peter Yu v. Vassar Coll.</u>, 97 F. Supp. 3d 448,
> 480 (S.D.N.Y. 2015).

153. In this case, the Defendant Marist College, by and through its employees,

representatives, and agents including, but not limited to Meyer, Yough, and Campa, had a duty

and obligation to follow its own Marist Title IX Procedures when conducting the investigation

and hearing on the issue of "dating abuse" against the Plaintiff Doe.

154. Marist College, by and through its employees, representatives, and agents including,

but not limited to Meyer, Yough, and Campa, engaged in selective enforcement based on Doe's

gender and intentionally, and/or recklessly, and/or negligently, breached its said duty to conduct the investigation and hearing in accordance with Marist College's Title IX Policy.

155. In contravention of its own Title IX Policy, and federal law, the College by its employees, representatives, and agents including, but not limited to Myer, Yough, and Campa, engaged in, and allowed, various highly prejudicial irregularities to occur both during the investigation and hearing.

156. Therefore, the decision and sanctions against Doe were obtained illegally and improperly, and but be vacated and cancelled.

157. Title IX is enforceable through a private right of action, for monetary damages as well as injunctive relief.

158. This unlawful discrimination in violation of Title IX proximately caused Doe to sustain substantial injury, damage, and loss, including, but not limited to: emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries, medical treatment costs and expenses, which is still ongoing, and other direct and consequential damages.

159. As a result of the foregoing, Plaintiff Doe is entitled to a judgment awarding John Doe damages in an amount to be determined at trial, but in no event less than $2,000,000.00, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as the following money damages, injunctive relief, declaratory judgment, against the defendant Marist College:

(i) a declaratory judgment vacating and cancelling and/or otherwise reversing the decision and sanctions against the plaintiff Doe; and

(ii) a declaratory judgment expunging and removing from the plaintiff Doe's Marist College transcript and disciplinary record any negative notations and or findings regarding the reporting party's complaint, and otherwise removing any negative notations forthwith; and

(iii) reinstating the plaintiff Doe back into Marist College forthwith; and

(iv) the return of all monies paid by Doe to the College to date; and

(v) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and

(vi) any and all further actions required to return Plaintiff to the status quo ante; and

(vii) money damages for lost college, career, and job opportunities, in an amount to be determined by this Court, but in no event less than $2,000,000.00; and

(viii) money damages for loss of financial aid, grants, and/or scholarships, and in having to pay more money for college and housing; and

(ix) money damages for pain and suffering for the psychological stigma of "dating abuser;" and

(x) money damages for wrongfully tarnishing plaintiff Doe's college transcript and reputation and cause loss of income and loss of future income; and

(xi) judgment to recover medical fees and payments for treatment proximately attributable to said breach; and

(xii) for whatever other and further relief the court deems appropriate under the circumstances.

## AS AND FOR SEVENTH CAUSE OF ACTION

160. Plaintiff Doe repeats and realleges each and every allegation in paragraphs "1" through "159" hereof as if same were fully set forth herein at length.

161. Marist College had a duty to keep its students safe from harm, pain and suffering, mental duress, and extreme psychological damage.

162. At all times relevant herein, Marist College owned, controlled, and managed the premises located at Marist College known as the "Steel Plant."

163. Marist College, its various employees including, but not limited to, Meyer and Yough, had knowledge, and notice, that a Dutchess County Family Court protective order was in place and Marist College should have created a schedule whereby Doe and the Reporting Party could utilize the Steel Plant facility on Marist Property (where fashion major students gather to do their work) at difference dates and times so that they would not meet.

164. Marist College, its various employees including, but not limited to, Meyer and Yough, breached its duty (both contractual and under tort negligence law) to keep its students safe from harm, pain and suffering, mental duress, personal injury, and extreme psychological damage, by negligently failing to timely create a schedule by which Doe and the Reporting Party could use and utilize the Steel Plant at different dates and times and not meet each other. (Doe's tuition was paid in full and he had the right to utilize the Steel Plant facility to do his work.)

165. It was foreseeable to Marist College, its various employees including, but not limited to, Meyer and Yough, that since both Doe and the Reporting Party were fashion majors, they would unintentionally and/or randomly meet at the Steel Plant facility, and that the Reporting Party would call the police pursuant to the aforesaid protective order, and that the plaintiff Doe would suffer harm, pain and suffering, mental duress, personal injury, and extreme psychological damage.

166. In fact, the day after the family court order was finalized on April 25, 2024, when Doe was peacefully at the Steel Plant to do his work, as was foreseeable by the defendant Marist

College, its employees, agents, and representative including, but not limited to Meyer and Campa, the Reporting Party called the police and 3 police cars arrived at the Steel Plant.

167. It was extremely traumatic as Doe had never in his life been approached by the police and retained. In addition to fear and extreme emotional stress and duress, Doe also suffered humiliation, embarrassment, and loss of reputation, as this occurrence was at Doe's school, in front of Doe's peers and professors.

168. The police and campus security questioned Doe and being satisfied Doe did not violate the protective order, no further action was taken.

169. When Doe complained about this negligence and lack of schedule to Meyer and Yough they both minimized it and though it insignificant and did not even acknowledge the fact that both the police and Marist campus security had interviewed both Doe and the Reporting Party and determined Doe did not violate the protective order and took no further action.

170. The defendant Marist College breached its contractual duty to keep its students safe, including plaintiff, and was otherwise negligent in all respects and in allowing plaintiff to suffer damages.

171. Wherefore, plaintiff Doe seeks money damages for pain and suffering, fear, humiliation, loss of reputation, and extreme psychological damages, duress, stress, and mental harm, which requires, and continues to require, medical treatment, in an amount to be determined by the court, but in no event less than $2,000,000.00, plus medical costs and fees for Doe's ongoing treatment, plus attorney's fees, costs, and disbursements.

## AS AND FOR AN EIGHTH CAUSE OF ACTION

172. Plaintiff Doe repeats and realleges each and every allegation in paragraphs "1" through "171" hereof as if same were fully set forth herein at length.

173. Marist College, its various employees including, but not limited to, Meyer, Yough, and Campa, were in a position of power over Doe.

174. Meyer, Yough, and Campa, through their various misconduct, bad acts, arbitrary and capricious rulings, and intentional and/or reckless and/or or negligent violations of Marist College's own Title IX Policy, not only unlawfully impacted the outcome of the Title IX adjudication, but also created a hostile and psychologically damaging environment to Doe.

175. Meyer, Yough, and Campa, knew or should have known, and had constructive and actual notice, that their actions would dramatically affect Doe's life, education, career, and cause severe financial damages to Doe, as well as psychological damages, stress and mental duress and suffering and trauma.

176. Doe was otherwise bullied, intimidated, harassed, humiliated, unduly reprimanded, by Marist College, through its various employees, Meyer, Yough, and Campa, and Doe was caused to suffer extreme emotional suffering, duress, fear, and psychological trauma and mental pain and suffering.

177. Doe was the recipient of reverser gender-discrimination by Marist College, through its various employees, Meyer, Yough, and Campa, more specifically in that if the reporting party engaged in similar conduct alleged against Doe, it was minimized, ignored, not acknowledged, and various rulings with respect to the hearing were improperly in favor of the reporting party and against Doe.

178. The conduct of Meyer, Yough, and Campa, was no less than bullying, intimidation, and procedural irregularity, which caused grave psychological damages,  distress, pain and suffering to plaintiff Doe, which required, and continues to required, medical treatment.

179. MARIST by its employees, representatives, and agents including, but not limited to, Meyer, Yough, and Campa,  authorized, condoned, and/or acquiesced to discriminatory conduct against Plaintiff including, but not limited, to the following:

(a) precluded plaintiff from questioning the Title IX Investigator; (b) precluded plaintiff from asking relevant questions to the Reporting Party; (c) put into evidence an unreliable, irrelevant, and highly inflammatory "anonymous report" with no witness to cross-examine; (d) improperly put into evidence a Family Court protective order; (e) granted no accommodations as arranged prior to the hearing with the Marist College Office of Accommodations and Accessibility; (f) Meyer refused to interview the only witness Doe requested; (g) Meyer and Yough met with Doe without advisor or attorney present; (h) Meyer and Yough and Campa punished plaintiff despite having prior knowledge and notice of his medical diagnosis/prognosis provided by his treating physician, and otherwise disregarded the protections under federal law afforded to those similarly situated; (i) Campa arbitrarily reversed rulings to intentionally prejudiced Doe; (j) Campa precluded the Investigator Meyer to be questioned about the interview reports he had conducted and prepared and that contained exculpatory evidence in Doe's favor; (k) not allowing Doe to submit any evidence directly to the hearing panel at the hearing; (l) Campa arbitrarily and without cause severely restricted the time for Doe to question the Title IX Investigator; (m) Campa reminding Doe's advisor that he could question the witnesses directly knowing none were appearing; and (n) and otherwise in deviating from Marist

College's own Title IX Policy;  (o) denying Doe's federal rights to due process; and (p) and not allowing evidence to be presented to the hearing panel.

180. Wherefore, plaintiff Doe seeks money damages for pain and suffering, fear, humiliation, loss of reputation, and extreme psychological damages, stress, and mental harm, which requires, and continues to require, medical treatment, in an amount to be determined by the court, but in no event less than $2,000,000.00, plus medical costs and fees for Doe's ongoing treatment, plus attorney's fees, costs, and disbursements.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, for the foregoing reasons, Plaintiff Doe demands judgment against Defendant MARIST COLLEGE as follows:

(a) On the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment awarding John Doe damages in an amount to be determined at trial, but in no event less than $2,000,000.00, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as the following money damages, injunctive relief, and declaratory judgment:

(i) a declaratory judgment vacating and cancelling and/or otherwise reversing the decision and sanctions against the plaintiff Doe; and

(ii) a declaratory judgment expunging and removing from the plaintiff Doe's Marist College transcript and disciplinary record any negative notations and or findings regarding the reporting party's complaint, and otherwise removing any negative notations forthwith; and

(iii) reinstating the plaintiff Doe back into Marist College forthwith; and

(iv) the return of all monies paid by Doe to the College to date; and

(v) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and

(vi) any and all further actions required to return Plaintiff to the status quo ante; and

(vii) money damages for lost college, career, and job opportunities, in an amount to be determined by this Court, but in no event less than $2,000,000.00; and

(viii) money damages for loss of financial aid, grants, and/or scholarships, and in having to pay more money for college and housing; and

(ix) money damages for pain and suffering for the psychological stigma of "dating abuser;" and

(x) money damages for wrongfully tarnishing plaintiff Doe's college transcript and reputation and cause loss of income and loss of future income; and

(xi) judgment to recover medical fees and payments for treatment proximately attributable to said breach; and

(xii) for whatever other and further relief the court deems appropriate under the circumstances;

(b) On the second cause of action for breach of contract, a judgment awarding John Doe damages in an amount to be determined at trial, but in no event less than $2,000,000.00, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as the following money damages, injunctive relief, and declaratory judgment:

(i) a declaratory judgment vacating and cancelling and/or otherwise reversing the decision and sanctions against the plaintiff Doe; and

(ii) a declaratory judgment expunging and removing from the plaintiff Doe's Marist College transcript and disciplinary record any negative notations and or findings regarding the reporting party's complaint, and otherwise removing any negative notations forthwith; and

(iii) reinstating the plaintiff Doe back into Marist College forthwith; and

(iv) the return of all monies paid by Doe to the College to date; and

(v) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and

(vi) any and all further actions required to return Plaintiff to the status quo ante; and

(vii) money damages for lost college, career, and job opportunities, in an amount to be determined by this Court, but in no event less than $2,000,000.00; and

(viii) money damages for loss of financial aid, grants, and/or scholarships, and in having to pay more money for college and housing; and

(ix) money damages for pain and suffering for the psychological stigma of "dating abuser;" and

(x) money damages for wrongfully tarnishing plaintiff Doe's college transcript and reputation and cause loss of income and loss of future income; and

(xi) judgment to recover medical fees and payments for treatment proximately attributable to said breach; and

(xii) for whatever other and further relief the court deems appropriate under the circumstances;

(c) On the third cause of action for violation of Title IX and gender discrimination Plaintiff Doe, a judgment awarding John Doe damages in an amount to be determined at trial, but in no event less than $2,000,000.00, plus prejudgment interest, attorneys' fees, expenses, costs

and disbursements, as well as the following money damages, injunctive relief, and declaratory judgment:

(i) a declaratory judgment vacating and cancelling and/or otherwise reversing the decision and sanctions against the plaintiff Doe; and

(ii) a declaratory judgment expunging and removing from the plaintiff Doe's Marist College transcript and disciplinary record any negative notations and or findings regarding the reporting party's complaint, and otherwise removing any negative notations forthwith; and

(iii) reinstating the plaintiff Doe back into Marist College forthwith; and

(iv) the return of all monies paid by Doe to the College to date; and

(v) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and

(vi) any and all further actions required to return Plaintiff to the status quo ante; and

(vii) money damages for lost college, career, and job opportunities, in an amount to be determined by this Court, but in no event less than $2,000,000.00; and

(viii) money damages for loss of financial aid, grants, and/or scholarships, and in having to pay more money for college and housing; and

(ix) money damages for pain and suffering for the psychological stigma of "dating abuser;" and

(x) money damages for wrongfully tarnishing plaintiff Doe's college transcript and reputation and cause loss of income and loss of future income; and

(xi) judgment to recover medical fees and payments for treatment proximately attributable to said breach; and

(xii) for whatever other and further relief the court deems appropriate under the circumstances;

(d) on the fourth cause of action for breach and violation of covenant of good faith and fair dealing, implied in the contract by and between plaintiff Doe and defendant Marist College, , a judgment awarding John Doe damages in an amount to be determined at trial, but in no event less than $2,000,000.00, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as the following money damages, injunctive relief, and declaratory judgment:

(i) a declaratory judgment vacating and cancelling and/or otherwise reversing the decision and sanctions against the plaintiff Doe; and

(ii) a declaratory judgment expunging and removing from the plaintiff Doe's Marist College transcript and disciplinary record any negative notations and or findings regarding the reporting party's complaint, and otherwise removing any negative notations forthwith; and

(iii) reinstating the plaintiff Doe back into Marist College forthwith; and

(iv) the return of all monies paid by Doe to the College to date; and

(v) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and

(vi) any and all further actions required to return Plaintiff to the status quo ante; and

(vii) money damages for lost college, career, and job opportunities, in an amount to be determined by this Court, but in no event less than $2,000,000.00; and

(viii) money damages for loss of financial aid, grants, and/or scholarships, and in having to pay more money for college and housing; and

(ix) money damages for pain and suffering for the psychological stigma of "dating abuser;" and

(x) money damages for wrongfully tarnishing plaintiff Doe's college transcript and reputation and cause loss of income and loss of future income; and

(xi) judgment to recover medical fees and payments for treatment proximately attributable to said breach; and

(xii) for whatever other and further relief the court deems appropriate under the circumstances;

(e) on the fifth cause of action for violation of New York State Human Rights Law, a judgment awarding John Doe damages in an amount to be determined at trial, but in no event less than $2,000,000.00, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as the following money damages, injunctive relief, and declaratory judgment:

(i) a declaratory judgment vacating and cancelling and/or otherwise reversing the decision and sanctions against the plaintiff Doe; and

(ii) a declaratory judgment expunging and removing from the plaintiff Doe's Marist College transcript and disciplinary record any negative notations and or findings regarding the reporting party's complaint, and otherwise removing any negative notations forthwith; and

(iii) reinstating the plaintiff Doe back into Marist College forthwith; and

(iv) the return of all monies paid by Doe to the College to date; and

(v) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and

(vi) any and all further actions required to return Plaintiff to the status quo ante; and

(vii) money damages for lost college, career, and job opportunities, in an amount to be determined by this Court, but in no event less than $2,000,000.00; and

(viii) money damages for loss of financial aid, grants, and/or scholarships, and in having to pay more money for college and housing; and

(ix) money damages for pain and suffering for the psychological stigma of "dating abuser;" and

(x) money damages for wrongfully tarnishing plaintiff Doe's college transcript and reputation and cause loss of income and loss of future income; and

(xi) judgment to recover medical fees and payments for treatment proximately attributable to said breach; and

(xii) for whatever other and further relief the court deems appropriate under the circumstances;

(f) on the sixth cause of action for violation of Title IX and selective enforcement, , a judgment awarding John Doe damages in an amount to be determined at trial, but in no event less than $2,000,000.00, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as the following money damages, injunctive relief, and declaratory judgment:

(i) a declaratory judgment vacating and cancelling and/or otherwise reversing the decision and sanctions against the plaintiff Doe; and

(ii) a declaratory judgment expunging and removing from the plaintiff Doe's Marist College transcript and disciplinary record any negative notations and or findings regarding the reporting party's complaint, and otherwise removing any negative notations forthwith; and

(iii) reinstating the plaintiff Doe back into Marist College forthwith; and

(iv) the return of all monies paid by Doe to the College to date; and

(v) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and

(vi) any and all further actions required to return Plaintiff to the status quo ante; and

(vii) money damages for lost college, career, and job opportunities, in an amount to be determined by this Court, but in no event less than $2,000,000.00; and

(viii) money damages for loss of financial aid, grants, and/or scholarships, and in having to pay more money for college and housing; and

(ix) money damages for pain and suffering for the psychological stigma of "dating abuser;" and

(x) money damages for wrongfully tarnishing plaintiff Doe's college transcript and reputation and cause loss of income and loss of future income; and

(xi) judgment to recover medical fees and payments for treatment proximately attributable to said breach; and

(xii) for whatever other and further relief the court deems appropriate under the circumstances;

(xi) for whatever other and further relief the court deems appropriate under the circumstances;

(g) on the seventh cause of action for negligence, Doe seeks money damages for pain and suffering, fear, humiliation, loss of reputation, and extreme psychological damages, duress, stress, and mental harm, which requires, and continues to require, medical treatment, in an amount to be determined by the court, but in no event less than $2,000,000.00, plus medical costs and fees for Doe's ongoing treatment, plus attorney's fees, costs, and disbursements;

(h) on the eighth cause of action for bullying, intimidation, harassment, reverse gender-discrimination, creating unsafe and hostile school environment and causing plaintiff to suffer extreme emotional suffering, duress, fear, and psychological damages, trauma and mental pain and suffering, plaintiff Doe seeks money damages for pain and suffering, fear, humiliation, loss of reputation, and extreme psychological damages, stress, and mental harm, which requires, and continues to require, medical treatment, in an amount to be determined by the court, but in no event less than $2,000,000.00, plus medical costs and fees for Doe's ongoing treatment, plus attorney's fees, costs, and disbursements;

(i) and for whatever other and further relief the court deems just and proper under the circumstances.

<u>JURY DEMAND</u>

Plaintiff Doe herein demands a trial by jury of all triable issues in the present matter.

Dated: New York, New York
      October 24, 2024

           Respectfully submitted,

           _____
           LEONARD J. CATANZARO, ESQ.
           Attorney for Plaintiff Doe
           555 Lenox Avenue, Suite 2F
           New York, New York 10037
           (212) 226-1234
           lcatanzarolaw@quicklien.com

EXHIBT A

(UNDER SEAL BY COURT ORDER)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

JOHN DOE,                                                    Case No.

                    Plaintiff,

        v.

MARIST COLLEGE,

                    Defendant.

------------------------------------------------------------------------x

COMPLAINT & DEMAND FOR JURY TRIAL

LEONARD J. CATANZARO, ESQ.
Attorney for Plaintiff
Office and Post office Address,
555 Lenox Avenue, Suite 2F
New York, New York 10037
(212) 226-1234

SIGNING REQUIREMENT

I, the undersigned, duly admitted to practice law in New York State, plaintiff's attorney of record in the above action, under penalty of perjury do affirm that the following statement is true:

That, pursuant to section 130 - 1.1-a of the Rules of the Chief Administrator (22 NYCRR), by signing the papers herein certify that to the best of my knowledge, information and belief, formed under an inquiry reasonable under the circumstances, the presentation of the papers or the contentions herein are not frivolous as defined in subsection (c) of section 150-1.1.

Dated: New York, New York
        October 24, 2024

_____
LEONARD J. CATANZARO, ESQ.